If it pleases the Court, my name is Michael Bigelow and I represent the appellant Mr. Broadnax. For one of the few times my standing at this podium and others, I don't really know where to begin. So what I thought I would do is talk, start at least, with the search and Mr. Broadnax's consent. I really would like to talk about the failure of the Court to grant sufficient time to continue the case so that trial counsel could proceed with a more thorough investigation of the... JUSTICE SCALIA You had a week, right? MR. BROADNAX No. JUSTICE SCALIA You had four days? MR. BROADNAX He had four days. He received, I'm not sure exactly... JUSTICE SCALIA Working days? Can I just ask a real pedestrian question? Were those all weekdays in which there would be availability of the people that you might need to talk to? MR. BROADNAX He had four business days. He got the information so much for consent. He got the information. Wednesday afternoon, in Mr. Wong's terms, EOT, which I take as EOD, end of day. Let me tell you what the problem is and why it was so difficult. And I think that it's a matter of record. Now, there's a part of the record I'm going to admit to the Court, and I've already told trial counsel, I've already told appellate counsel that it's a bit of an extrapolation, but I'm going to try to do it without violating any rules of court. How about that for a preface? JUSTICE SCALIA We'll see if you succeed. MR. BROADNAX Yeah, we will. So I don't think I need to go through the chronology or the litany of misrepresentation is too strong a word, mistakes. If it were clear misrepresentations, I would have made it a prosecutorial misconduct. I don't think it is. Mr. Wong starts out in camera telling the trial judge, look, this is a 288. It is an oral cop, but it's not your usual 288. It is he, meaning the witness, knew the victim, they were friends, they had a dating relationship, and everybody knows that a 288, which in the State of California, I put up my brief, is 14 years old or younger, everybody knows that that wouldn't have happened. Okay. So hold that thought for just a moment. Then at trial, at some point in trial, Mr. Wong says to the judge in an argument to the presence of the jury, look, this thing was not, this was not a stat rape, this was an oral copulation of a 14-year-old. Now, having very clearly in camera inferred that it was nothing more than a stat rape, grandma found out about it, reported it, didn't get any jail time. All right. So we've got those two. Then during trial, during trial, when he is examining the witness, when he's examining the witness, he says, okay, you knew the girl, how old was she? She was 14, or how old was she? She was 17 years old, she was 16 years old, the dates kind of vary, you were 18 years old. Then at another point, and he says, yeah, yeah, yeah, yeah, yeah, the witness says, yeah, yeah, yeah, yeah, yeah. Then at another point in the cross-examination, he says, he says, and this is at 304 of the, 304 of the excerpts of record, Mr. Wong says, how, we've got the witness on the stand. How old was the female? She was 17. Question, 17? Now, Mr. Wong at this point knows that it's a 288, that it's a, should be, it's a 288. He has already said it's a 288, which means under 14. Nobody bothers to correct that. He doesn't correct it, judge doesn't correct it, which is irritating, but that's neither here nor there. But I, but I know why. I mean, and, and here's why. He says, the witness says, correct, age 17. Now, here's the kicker. And did you know her? Answer, no. All right? That is in direct contravention to what he has testified earlier about knowing the girl, dating relationship, grandma got involved. But did you get to impeach him on that, on the fact that it was different from what he'd said earlier? He had an opportunity, but here's, here's the problem, Your Honor, if I may. Did you know her? No. Did she, this is Wong, cleaning it up. Did she, and I don't mean that pejoratively, but did she, I mean, did she have some involvement with you? Trial counsel objects, da-da-da-da-da-da. I knew her from the neighborhood. Was the Sex Act consensual? Yes, it was. Well, 288 is a nonconsensual act with a 14-year-old. There's no consent involved. All right? So is your argument that, that this all should have come in under 608B? No, Your Honor. I mean, we're going to get into all the details in a moment. Here's the push. Here's what, here's what's happened. We got a 261 out there with a 17-year-old grandma got involved. We have a second. So he's told the jury that he was convicted of 261 and 288, right? The jury heard that? No, that's the problem. They got. They didn't know he was convicted? They got conflated, Your Honor. No, they got conflated. That's. Did the jury know that he had a prior conviction for a sex offense? Yeah, I knew he had a prior conviction for one sex offense, but I'm talking two. I'm He's talking on one hand about a 261.5, which actually occurred in 1988. The 288 occurred in 1989, along with the sodomy that we talk about. We're talking actually three sexual offenses, and this is the proof of the pudding. It's inferred here. I don't have the rap sheet. The rap sheet wasn't made a part of the record. Well, wasn't the rap sheet turned over by Mr. Wong to defense counsel? Yeah. Isn't that what they said? For both offenses? Yeah. Four business days? I can't help what he didn't pick up. For both offenses? The entire rap sheet. The rap sheet for both offenses? Yes, but — So — and was there an opportunity to cross-examine? Yes. When the trial resumed? Yes. Why doesn't that answer the question? Because Mr. Wong didn't clarify it. What Mr. Wong should have done is he should have — he is mixing and matching. He — and I'm not convinced Wong — Mr. Wong. I'm not convinced Mr. Wong knew the difference. I'm not convinced he knew the difference. But that's not the answer to my question. Sorry. No. Go right ahead. My question still is, prior to the trial resuming, defense counsel had copies of the rap sheets making clear there were two separate offenses, two separate convictions. No. Wasn't there — is that right? No. Number one. No. What was turned over in the — with four days left to follow up? Correct. What was? The rap sheet. Which one? The rap sheet, period. All of it. For showing — showing what? All the offenses? Did it show both the 261 and the 288? I'm going to ask a rhetorical question, and perhaps this is impolitic, but I don't know. I can ask it this way. You ever read a California rap sheet? They're horrible. They are horrible, Your Honor. There are many experiences I have not enjoyed. Yes. Thank you. Okay. Are we talking about something that's in the record here? I mean — The record — Is the rap sheet in the record? No, that's the — no, it's not. I'm telling you, I'm extrapolating from the record. Okay. But we do know that the rap sheet was turned over to defense counsel, and defense counsel had four working business days in order to investigate it, and an opportunity to cross-examine the defendant on whatever the result of that investigation may have been. We don't know what the result was. But the CI was not cross-examined on this point at trial. Is that the state of the record, Mr. Bigelow, that — The state of the record — Extrapolating, as you ask us to do? He — the state of the record is that with additional time, he — with additional time — Mr. Bigelow, I know — I understand what you're saying. I'm just trying to figure out what the record shows here, and — The record — Am I correct that the defense counsel had the rap sheet, and the CI was not cross-examined on the fact that he had three sex convictions rather than one? That is a fair statement, Your Honor. Okay. That is correct. Yes. I apologize. Yes. I just wanted to figure out what the state of the record was. No. No, no, no, no. That is a — What does that have to do with more time? Well, more time folds into the question of whether — more time, Your Honor, folds into the question of whether, since Mr. Wong opened the door to permit the witness to minimize the relationship between the victim and himself, more time would have permitted trial counsel and his investigator to investigate the substance of that claim and to learn — Of what claim? To learn that the relationship between the 288 victim, which he testifies to here, apparently that the relationship between the 288 victim, the 14-year-old, was nonconsensual, was a stranger — I'm going to call it a stranger rape for lack of anything else — a stranger encounter, that Grandma did not intercede in that particular event. Now, Mr. Wong makes it very — I'm confused. You're talking about the — Exactly. You haven't heard my question. You're right, but I'm confused. Exactly what? It's very confusing. That's the problem. That's why I was asking a question. Go ahead, Your Honor. You want to hear what the question is? I do. You're talking about somebody's — are you talking about the informant? Yes, Your Honor. It's the informant. And what difference would more time have made? I still don't get it. You answered to Judge Rosenthal. You said, boy, those California rap sheets are hard to read. But what would more time have done? Would it have given more time to decipher the rap sheet? How would he have been able to untangle these facts? Because Mr. Wong and the witness are arguing that the 288 was committed against a 17-year-old and Grandma interceded. That's what this relates to. But they've got it confused as well. They have it confused as well. Did you hear my question? Yes. How would more time have helped? It would have permitted trial counsels and his investigator to track down the court records and to confirm the age, the event, the dates, the witnesses, the reporting parties. But your answer was those rap sheets are hard to read, and he couldn't even cross-examine him or impeach him with the rap sheet because he couldn't figure out what was on it. How would more time have helped? He couldn't read it in four days, but he could have read it in six days or eight days or ten days. He would have been able to read it. I'm having trouble understanding. His investigator, Your Honor, did explain to the trial court why he needed additional time. He needed additional time to go to the courts to obtain those records. He had gone to the courts to attempt to obtain those records and was told by the court, by the court clerks, that they were unavailable, wouldn't be available for ten days. He goes back to the trial court, to the district court, and explains that to the district court and says, I don't care. Basically, he says, I don't care. The other problem was that these records were not in Sacramento, so it's not a matter of just going across the street. They were actually in Stockton, which is 45 miles away. I know you're about to run out of time, but I do have one other follow-up question on this. The record seems to show that even with these limits, that the defense counsel was able to get out of the Mr. Bailey, the confidential informant, that he lied when he said that the victim of the sex offense was 17. He says, if you say so, when there was a challenge, well, if you said she was 17, that wasn't true, was it? And the answer was, if you say so, correct, yes. What more do you need? We're going back to age 16, and what more do we need? So you want not only a lie, but a lie that it was not only not 17, it was 14. And not don't forget the witness minimized. He said, well, look, we were in a dating relationship, and et cetera, et cetera, et cetera. So you really do want a trial within a trial. You want to prove up all the facts surrounding the prior 288, 261.5, and whatever the third connection was. None of which would have been necessary if the Court ---- None of which would have been admissible. That's the problem with the rule. Well, but the Court admitted it on the other way around. Well, with limits. And how much more do you get to go beyond those limits? Well, the Court ---- the prosecutor went into great detail. You're in a dating relationship. Grandma interceded, and it was no big deal. And you wound up getting probation. Well, he's obviously talking about the 261. He certainly isn't talking about the 288. Counsel, what do we do with the fact that all the drugs and the money and the scales and everything else was found in his house? And the district court held a two-day evidentiary hearing and made very specific findings of fact as to who was telling the truth and who was lying. And then with regard to the consent issue, I mean, even if Mr. Bailey lied, what difference did it make to this jury in the face of that evidence? Because the critical issue was what Mr. Bailey saw with respect to the gun in the car and whether he was being truthful about that, at least as far as ---- And the girlfriend said, not my gun, not my dope, not my money. You ask the question in a way that my only response is juries can do anything they want. Would they have? I suspect not. You ask my opinion? I suspect not, because that testimony, that testimony ---- Well, do we have to have a reasonable doubt as to whether or not the exclusion of Mr. Bailey's testimony or the exposure of the lie with regard to the voluntariness of the sex act would have caused the jury to have a reasonable doubt as to whether or not he possessed large quantities of narcotics and money and scales with intent to distribute? I don't see how that would have ---- I'm only ---- I don't see how that would make a whitta difference. I'm concerned about the gun in the car. But there was a mistrial on that count, so doesn't that sort of underscore the harmlessness of any error there? Kind of how I'm looking at it. But it doesn't ---- It sounds like you're speechless. Well, you're out of time too, so ---- I am out of time. You're out of time. Why don't you ---- Why don't you ---- We'll give you a little time for a bottle, and why don't you gather yourselves. Thank you very much. We'll hear from the Governor. May it please the Court. Audrey Hemesath from the U.S. Attorney's Office in Sacramento, and I was co-trial counsel on this case as well. The focus on Mr. Bailey's criminal convictions is really misplaced. As Your Honors just identified, the three counts of conviction here are supportable entirely by the 911 call, Mr. Brodnax's own testimony that he slept in the bed and that that was his marijuana that was found under the bed. He's simply denying ownership of the gun. The jury was free to disregard that statement, that self-serving statement, and just on circumstantial evidence alone find that he was a felon in possession, which they did in Count 4. The other two counts of conviction are the possession of marijuana with intent to distribute. Again, he admits his marijuana, that it's his marijuana. He admits he was there in the car outside Mr. Bailey's house. He admits that he had marijuana in the car and that he was in that very car that Mr. Bailey identifies on the 911 call. So it's a misplaced idea that the idea of more time to be able to impeach Mr. Bailey with his criminal convictions would have been relevant or admissible, and that's exactly the finding that the district court made in this case. There was no abuse of discretion in denying the motion for continuance. There are four other issues raised in this case. There's the question of the suppression motion, and I don't know if the Court has any particular questions. There's the 404B as well. But I'll say briefly on the suppression hearing, the Georgia v. Randolph requirement is that there be an express refusal, and that's a credibility issue. The district court here made very well-supported credibility findings, crediting the testimony of the officers. There just was no express refusal at the doorway here. The consent comes from the girlfriend whose house it is, making it a valid warrantless search. Okay. Thank you. Thank you. If I could take a minute for rebuttal. If Bailey hadn't seen him with a gun, the jury may not have been so intent on finding the gun in relation to the drugs. Thank you. Okay. Thank you. Case is argued. We'll stand for a minute.
judges: Rosenthal, Kozinski, Tallman